**THIRD DIVISION**
**ELLINGTON, P. J.,**
**ANDREWS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 7, 2017**

# In the Court of Appeals of Georgia

A17A1191. SMITH et al. v. BRASWELL et al.

RICKMAN, Judge.

T'Miaya Smith's son, J. H., began having seizures after his birth and a head CT scan revealed ischemic injuries to his brain.[1] Smith[2] filed suit against Lauren Braswell (a midwife who provided care to Smith during her labor and delivery), and Atlanta Women's Health Group (Braswell's employer) (collectively, "Braswell"), alleging that Braswell was negligent in the management of Smith's labor and delivery and seeking damages.[3] Braswell filed a motion seeking to exclude the testimony of Dr.

---

[1] Ischemic injuries result from diminution or lack of blood flow.

[2] Jamaal Hayes, Sr., J. H.'s father, was also a plaintiff but he voluntarily dismissed his claims.

[3] Smith also filed suit against Northside Hospital, the hospital where J. H. was delivered, but Northside Hospital entered into a settlement agreement with Smith, was

Barry Schifrin, one of Smith's expert witnesses, a motion to exclude causation testimony from any of Smith's expert witnesses, and a motion for summary judgment. The trial court granted Braswell's motions. Smith appeals and for the following reasons, we affirm.

1. Smith contends that the trial court erred in granting Braswell's motion to exclude the testimony of her expert witness, Dr. Schifrin. We disagree.

"The determination of whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." (Citation and punctuation omitted.) *HNTB Ga., Inc. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010). OCGA § 24-7-702 (b)[4], which governs the admissibility of expert testimony in civil cases, provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

---

dismissed from this action, and is not a party to this appeal.

[4] Because the hearing on Braswell's motions took place in June 2016, the new Evidence Code applies. See *Dempsey v. Gwinnett Hosp. System, Inc.*, 330 Ga. App. 469, 471 (1) (a), n. 3 (765 SE2d 525) (2014) ("The new Evidence Code became effective on January 1, 2013, and applies to any motion made or hearing or trial commenced on or after such date."). "Further, because OCGA § 24-7-702 is "substantively identical" to its predecessor statute, former OCGA § 24-9-67.1, cases decided under the former statute offer useful guidance when analyzing the current version of the statute." (Citation and punctuation omitted.) Id.

witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

"In determining the admissibility of expert testimony, the trial court acts as a gatekeeper, assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." (Citation omitted.) *HNTB Ga., Inc.*, 287 Ga. at 642 (1).

Reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

(Citation omitted.) Id. See *Kumho Tire Co. v. Carmichael*, 526 U. S. 137, 141 (119 SCt 1167, 143 LEd2d 238) (1999); see also *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579, 592-594 (II) (B) (113 SCt 2786, 125 LEd2d 469) (1993). "There are many different kinds of experts and many different kinds of

expertise, and it follows that the test of reliability is a flexible one, the specific factors neither necessarily nor exclusively applying to all experts in every case." (Citations and punctuation omitted.) *HNTB Ga.*, *Inc.*, 287 Ga. at 643 (1).

Applying those principles to the facts of this case, Dr. Schifrin is "an obstetrician/gynecologist with [a] subspecialty certification in maternal-fetal medicine." Currently, Dr. Schifrin primarily writes, researches, and gives lectures. Dr. Schifrin has not had hospital privileges since 2011, the last time he was a full time maternal-fetal medicine physician was approximately 17 years ago, and he has not regularly delivered babies since 2003.[5]

Dr. Schifrin opined that J. H.'s injury was the result of ischemia caused by "mechanical compressive forces" on his head during the course of Smith's labor. The mechanical compressive forces that Dr. Schifrin refers to are, inter alia, the use of pitocin, excessive uterine activity, malposition of J. H., pushing prior to Smith's full cervical dilation, and fundal pressure. Dr. Schifrin has coined this mechanism of injury, cranial compression ischemic encephalopathy ("CCIE").[6] In a thorough order,

_____

[5] Dr. Schifrin may have delivered one baby between 2005 and 2011.

[6] Smith spends a portion of her brief arguing that the trial court erred by focusing on the CCIE label for the alleged mechanism of injury in this case. However, it is clear from the trial court's order that it understands the causation theory in this

the trial court concluded that Dr. Schifrin's testimony and any expert testimony regarding the mechanism of injury posited by Dr. Schirifin would be inadmissible pursuant to OCGA § 24-7-702 (b) and the *Daubert* factors because Dr. Schifrin's theory has not been reliably tested, has not been subject to peer review and publication, is not generally accepted in the scientific community, and has not been clinically diagnosed in any other patients.

Smith argues that the trial court erred by failing to consider the causation opinions given by two of her other experts, Dr. Daune MacGregor, a pediatric neurologist and Dr. Thomas Paul Naidich, a neuroradiologist, notwithstanding the fact that the trial court cites to both Dr. Naidich's and Dr. MacGregor's deposition testimony in its order. Dr. Naidich deposed that he "will leave [clinical opinions about what specifically took place during the labor and delivery that might have caused or contributed to these injuries] to those who are truly expert in that. I'm the radiologist. Specific mechanical events in labor and delivery will be discussed by others. I will offer no opinion on those." Likewise, Dr. MacGregor deposed that her "understanding is [what causes compression resulting in injury] has to do with the amount of pressure that's put on by uterine contractions, that overcomes the natural case and that Dr. Schifrin uses the label CCIE to describe the theory.

mechanisms that maintain brain and blood supply" but she is "not an expert in the mechanics of delivery." Contrary to Smith's assertion that Dr. Schifrin's role is only one part of the causation theory, the case hinges upon the testimony of Dr. Schifrin as to the mechanical forces in labor that allegedly caused J. H.'s injury.

Dr. Schifrin co-authored a chapter of a book titled, "Cranial Compression Ischemic Encephalopathy: Fetal Neurological Injury Related to the Mechanical Forces of Labor and Delivery." In that chapter, Dr. Schifrin proposes the concept of CCIE and explains that "[t]he overall contribution of [mechanical] forces to ischemic brain injury during labor is difficult to establish, in no small measure because in modern obstetrics necessary details about theses various factors are often unmeasured, unrecorded, and not considered." In regards to testing of the theory, Dr. Schifrin writes, "[t]o isolate the contribution of mechanical factors it will be necessary for epidemiologic studies to adjust for the role of potentially mitigating factors" because "[w]e must learn more about the ability of the fetal skull to protect the fetal brain." Dr. Schifrin deposed that there have not been any long-term epidemiological studies on the mechanism of injury and that he "recommend[s] them in the context of understanding [CCIE] as a potential cause of injury." Dr. Naidich deposed that he was not aware of any studies that have looked at external pressure on

6

the skull causing this type of injury. Dr. Naidich deposed that if such studies existed he "would appreciate the reference just for [his] general knowledge." Dr. MacGregor deposed that she is not aware of any studies that determined the incidence rate of the proposed mechanism of injury in this case. Additionally, another one of Smith's experts, Dr. Paul Govaert, a neonatologist and pediatrician in Belgium and Holland, deposed that the "hypothesis" proposed by Dr. Schifrin was "possible" but that "we . . . still need some more research in science."

In regards to peer-reviewed literature about the alleged mechanism of injury in this case, Dr. Govaert deposed that he was not aware of any peer-reviewed articles about this type of injury caused by increased intracranial pressure because of increased intrauterine pressure. Because of this lack of peer-reviewed literature, Dr. Govaert deposed that he "should publish it if I can." Another one of Smith's experts, Dr. Cheng, a pediatric neurologist, deposed that he has never read any peer-reviewed literature on the alleged mechanism of injury in this case.

In his book chapter, Dr. Schifrin explains, himself, how this mechanism of injury is not accepted in the scientific community. Dr. Schifrin writes that "[i]n recent decades, only scant attention has been turned to the effects of the mechanical forces of labor and delivery on intracranial pressure" and "[t]he prevailing monolithic view

is that . . . contractile forces cannot be "excessive."" Additionally, Dr. Goavert deposed that Schifrin's theory is not well known amongst his colleagues which is a reason why he intended to write an article about the theory and publish it. See *Hendrix v. Evenflo Co., Inc.*, 609 F3d 1183, 1194 (B) (1) (11th Cir. 2010) ("Given time, information, and resources, courts may only admit the state of science as it is. Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.") (citations and punctuation omitted.).

Additionally, the trial court determined that lack of diagnosis in other patients of this mechanism of injury weighed against the theory's reliability.[7] Dr. Goavert deposed that he had never diagnosed one of his patients as having ischemic injury because of intrauterine pressure due to excessive intrauterine activity. Dr. Cheng deposed that he had never seen this mechanism of injury applied to this condition in terms of diagnosis. Dr. MacGregor deposed that she had never diagnosed this

---

[7] Smith argues the trial court erred by analyzing whether her experts had previously diagnosed this mechanism of injury. However, as noted above, the test of reliability is flexible and the factors do not necessarily or exclusively apply to every expert. See *HNTB Ga., Inc.*, 287 Ga. at 643 (1).

8

mechanism of injury but wondered if it would have applied to one previous patient. Moreover, Dr. Schifrin deposed that he had not diagnosed one of his patients in the past decade with an ischemic injury due to this mechanism of injury but that it "may" have happened to a previous patient.

Accordingly, under the circumstances of this case, the trial court did not abuse its discretion in concluding that "the preponderance of the evidence weighs against the admissiblity of the CCIE theory of causation under OCGA § 24-7-702 (b)" and thus "exclud[ing] the theory and Dr. Schifrin's testimony." See *Webster v. Desai*, 305 Ga. App. 234, 237 (1) (699 SE2d 419) (2010) (trial court properly excluded expert testimony in a medical malpractice case when the expert's theory was not supported by studies or peer-reviewed literature); see also *HNTB Ga., Inc.* 287 Ga. at 643 (1) (in a negligence action, trial court did not abuse its discretion in excluding expert testimony where the expert could not prove its theory was accepted and recognized by other practitioners in his field).

2. Smith contends that the trial court erred by granting summary judgment to Braswell. We disagree.

"In a medical malpractice case, the plaintiff must present expert medical testimony establishing that the defendant's negligence either proximately caused or

contributed to his injuries." (Footnote and punctuation omitted.) *Webster*, 305 Ga. App. at 238 (2). Contrary to Smith's assertion that additional evidence of causation remains in the record, the trial court clearly excluded not only Dr. Schifrin's testimony but all testimony as to the alleged mechanism of injury in this case. The trial court properly concluded that "[b]ecause the [trial court] has excluded [Smith's] theory of causation . . . an essential element of [Smith's] case is absent and summary judgment . . . must be granted." Accordingly, the trial court properly granted Braswell's motion for summary judgment. See Id.

*Judgment affirmed. Ellington, P. J., and Andrews, J., concur*.