# THIRD DIVISION
## DOYLE, P. J.,
## GOBEIL, J., and SENIOR APPELLATE JUDGE PHIPPS

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 31, 2023**

# In the Court of Appeals of Georgia

A23A0413. PREFERRED WOMEN'S HEALTHCARE LLC et al.
v. SAIN et al.

PHIPPS, Senior Appellate Judge.

Jason Sain, individually, as the administrator of the estate of his deceased wife Debbie Sain, and as next friend of the couple's minor child, brought this medical malpractice and wrongful death action against several defendants, including appellants Preferred Women's Healthcare, LLC ("PWH"); Lisa Dickerson, as executor of the estate of Byron Dickerson, M.D.; and Mary Long, M.D. These defendants appeal from the denial of their motion for a new trial following a jury verdict largely in Jason's favor. They contend that the trial court erred when it: (i) denied their motion to exclude the testimony of one of Jason's expert witnesses; and (ii) entered a judgment against them premised on an inconsistent verdict. For the

reasons that follow, we disagree with both contentions and affirm the trial court's judgment.

On appeal following a jury trial, we view the evidence in the light most favorable to the jury's verdict. *Moore v. Jackson*, 343 Ga. App. 532, 532 (807 SE2d 495) (2017). So viewed, the record shows that Debbie Sain became pregnant in early 2012, when she was 36 years old. Ultrasounds performed by two different PWH sonographers on April 3, 10, and 20, 2012, revealed a mass in Debbie's right adnexa.[1] On April 3, the mass measured between 5.7 and 6.27 centimeters, and it appeared to be unchanged on April 10 and 20. The sonographers documented their findings in Debbie's medical records to draw the mass to the attention of her PWH doctors.

Two expert witnesses testified at trial that the mass's appearance in April 2012 was consistent with a dermoid,[2] which typically will not resolve on its own, and one of Debbie's sonographers similarly thought that the mass was a dermoid. However, following the first ultrasound, the PWH obstetrician-gynecologist who met with

---

[1] The adnexa is the space inside a woman's abdomen and pelvis, between the inside of her abdominal wall and uterus, and includes all structures that attach to the uterus, such as the ovaries and fallopian tubes.

[2] A dermoid is a generally benign tumor of the ovary that may contain various elements, including skin, hair, and teeth.

2

Debbie — Audrey Arona, M.D. — shared no concerns about the results.[3] In fact, Debbie was not told about the mass during any of her PWH visits, and her medical records contain no indication that her doctors took any action related to the mass during her pregnancy. Moreover, while Debbie's obstetrical chart included a "problem list," the mass was not included on it.[4] Similarly, in Debbie's antepartum record, her adnexa was noted to be normal, and the mass was not documented in the space provided for ultrasound notes.

Sometime in April or May 2012, Dr. Dickerson, one of Debbie's PWH physicians, referred her to Charles Read, M.D., a maternal-fetal medicine specialist, for several reasons unrelated to her adnexal mass. When Debbie visited Dr. Read, PWH personnel did not inform him of the mass identified in the April 2012 ultrasounds.

---

[3] Dr. Arona was not named as a defendant in Jason's initial complaint. In 2019, we reversed the trial court's order granting Jason's motion to amend the complaint to add Dr. Arona as a party on the ground that his claims against her were barred by the statute of repose. *Preferred Women's Healthcare v. Sain*, 348 Ga. App. 481, 482, 490-491 (823 SE2d 569) (2019).

[4] A "problem list" is a tool for medical practitioners to share a patient's most pressing medical issues with other practitioners the patient may see.

An ultrasound performed in May 2012 in Dr. Read's office also indicated the presence of a right adnexal mass. But nothing in Debbie's medical records indicates that she or Jason was informed of the mass before she gave birth in November 2012. The couple likewise was not told of any problems requiring follow-up after their son's delivery, which was performed by Dr. Long via cesarean section. Moreover, during Debbie's delivery, Dr. Long did not identify the adnexal mass, and she did not know that a mass was seen in ultrasounds during Debbie's pregnancy.

On January 3, 2013, Debbie visited an emergency room, complaining of abdominal pain and a fever. When a CT scan showed a mass in her abdomen, she underwent emergency surgery performed by Dr. Dickerson. During the surgery, the mass — which measured 11 centimeters and had ruptured — was removed. Because the mass already had excreted 500 milliliters of dermoid contents into Debbie's pelvis, it likely measured between 12 and 15 centimeters before it ruptured.

The mass was found to contain squamous cell carcinoma arising from a mature teratoma.[5] Debbie's ensuing cancer treatment included several surgeries,

---

[5] A squamous cell carcinoma is an epithelial cancer that forms within a benign dermoid or teratoma. Two of Jason's expert witnesses testified that the terms "teratoma" and "dermoid" are interchangeable. Another expert testified that a dermoid is a subset of teratomas.

chemotherapy, radiation, and long stays in the hospital. The treatments ultimately were unsuccessful, and she died in December 2013.

In 2014, Jason brought this action for medical malpractice, wrongful death, and related claims against several defendants, including the appellants.[6] Before trial, the defendants moved to exclude the testimony of Christopher DeSimone, M.D. — an expert witness on the issue of causation — on the ground that his opinion as to the five-year survival rate for Debbie's cancer was neither scientifically reliable nor relevant to the issues in this case. In particular, the defendants challenged Dr. DeSimone's opinion that Debbie more likely than not would have lived for at least five years if her cancer had been diagnosed when it was still classified as stage 1, before the mass ruptured in January 2013. The defendants further contended that, without Dr. DeSimone's causation testimony, they were entitled to summary judgment.

The trial court initially granted in part the defendants' motion and barred Dr. DeSimone from providing "any opinion testimony based upon the extrapolation of data from the study of epithelial ovarian cancer." In that same order, the court denied the defendants' motion for summary judgment. The court subsequently

_____

[6] Because Dr. Dickerson died before trial, his estate was named as a defendant.

5

granted Jason's motion for reconsideration of its order partially excluding Dr. DeSimone's expert testimony, vacated the prior order, and denied the defendants' motion to exclude the testimony.

During the ensuing jury trial, both Dr. DeSimone and a second expert witness, James Quirk, M.D., testified that various medical professionals' failures to timely intervene when Debbie's right adnexal mass was discovered likely caused or substantially hastened her death. A third expert, John McBroom, M.D., testified that, as of Debbie's November 2012 delivery date, her cancer likely was confined to the inside of her adnexal mass and therefore classified as stage 1A. Dr. McBroom further testified that, had the mass been removed at or before that time, Debbie likely still would be alive. In addition, Debbie's gynecological oncologist, Rachel Grisham, M.D., similarly testified that the mass's rupture worsened Debbie's prognosis. The jury found in favor of Jason and against the appellants and awarded Jason a total of $8,520,182.60 in damages. The trial court denied the appellants' motion for a new trial, and this appeal followed.

1. We first address the appellants' contention that the trial court erred when it denied their motion to exclude Dr. DeSimone's causation testimony. They primarily argue that Dr. DeSimone improperly extrapolated the survivability of Debbie's cancer

6

from the survival rates for "general epithelial cancer." They further maintain that Dr. DeSimone's opinion was not grounded in relevant studies and literature and that his limited clinical experience with ovarian squamous cell carcinoma was insufficient to support his opinion. For the reasons that follow, the appellants have not met their burden of showing that the trial court abused its broad discretion in admitting Dr. DeSimone's testimony.[7] See *Emory Univ. v. Willcox*, 355 Ga. App. 542, 544 (1) (844 SE2d 889) (2020) (we review a trial court's decision to admit expert testimony for abuse of discretion); accord *Smith v. Braswell*, 342 Ga. App. 700, 701 (1) (804 SE2d 709) (2017).

"In a medical malpractice case, the plaintiff must present expert medical testimony establishing that the defendant's negligence either proximately caused or contributed to his injuries." *Braswell*, 342 Ga. App. at 705 (2) (citation and

---

[7] We do not address the appellants' challenge to the denial of their motion for summary judgment. "After verdict and judgment, it is too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case." *Kicklighter v. Woodward*, 267 Ga. 157, 162 (4) (476 SE2d 248) (1996) (citation and punctuation omitted). Consequently, in addressing the admissibility of Dr. DeSimone's testimony, we consider all of the evidence presented at trial. See id.; accord *Cook v. Huff*, 274 Ga. 186, 189 (5) (552 SE2d 83) (2001) (following a jury trial, an appellate court views the evidence that was "submitted to and considered by the jury," and not just that which was before the trial court when summary judgment was sought).

punctuation omitted). "[T]he expert's testimony must show as an evidentiary threshold that the expert's opinion regarding causation is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury." *Zwiren v. Thompson*, 276 Ga. 498, 501 (578 SE2d 862) (2003) (citation and punctuation omitted). OCGA § 24-7-702 governs the admissibility of expert testimony in Georgia. The version of that statute in effect during the relevant proceedings below[8] provided, in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
>> (1) The testimony is based upon sufficient facts or data;
>>
>> (2) The testimony is the product of reliable principles and methods; and

---

[8] OCGA § 24-7-702 was amended in 2022. See Ga. L. 2022, pp. 201-202, §§ 1, 4. Because the trial in this case took place in March 2022, before the July 1, 2022 effective date of the new statute, the prior version of the statute (which became effective in 2013) applies here. See Ga. L. 2022, p. 202, § 3 ("This Act shall become effective on July 1, 2022, and shall apply to any motion made or hearing or trial commenced on or after that date."); Ga. L. 2011, pp. 99, 124, 214, §§ 2, 101 (prior version of statute, effective January 1, 2013).

(3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

OCGA § 24-7-702 (b) (2013).

"In determining the admissibility of expert testimony, the trial court acts as a gatekeeper, assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." *Braswell*, 342 Ga. App. at 701 (1) (citation and punctuation omitted). Thus, in addition to gauging a witness's qualifications, the court also must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Wilson v. Redmond Constr.*, 359 Ga. App. 814, 820 (3) (860 SE2d 118) (2021) (citation and punctuation omitted); accord *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579, 589-592 (II) (B) (113 SCt 2786, 125 LE2d 469) (1993) (expert testimony is admissible only if it is both relevant and reliable).[9] "[A]n expert opinion is relevant if it will assist the trier of fact to understand the evidence or to determine a fact in

---

[9] Because OCGA § 24-7-702 is based on Federal Rule of Evidence 702, federal decisions such as *Daubert* and its progeny properly bear on the statute's construction. *Smith v. CSX Transp.*, 343 Ga. App. 508, 511 (1) (a), n. 5 (806 SE2d 890) (2017); see OCGA § 24-7-702 (f) (2013).

9

issue." *Cotten v. Phillips*, 280 Ga. App. 280, 286 (633 SE2d 655) (2006) (citation and punctuation omitted); accord OCGA § 24-4-401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

> Reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

*Braswell*, 342 Ga. App. at 701 (1) (citation and punctuation omitted). But because "the test of reliability is a flexible one, the specific factors neither necessarily nor exclusively apply[ ] to all experts in every case." Id. at 702 (1) (citation and punctuation omitted). Put another way, a trial court's "broad discretion in deciding how to assess the reliability of expert testimony" affords the court "considerable leeway in deciding which tests or factors to use to assess the reliability of an expert's methodology." *Smith v. CSX Transp.*, 343 Ga. App. 508, 512 (1) (b) (806 SE2d 890) (2017) (citations and punctuation omitted); accord *Kumho Tire Co. v. Carmichael*, 526 U. S. 137, 142 (119 SCt 1167, 143 LE2d 238) (1999) (the law grants a trial court

10

"the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination"). For example, "an expert need not have clinical studies to support his opinion, and an opinion will be admissible even if the expert admits there are some unknowns with respect to the plaintiff's injury." *Swint v. Alphonse*, 348 Ga. App. 199, 207-208 (2) (820 SE2d 312) (2018).

Importantly, "the proponent of the testimony does not have the burden of proving that it is scientifically correct, but [only] that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Med. Corp.*, 184 F3d 1300, 1312 (III) (C) (1) (b) (1) (11th Cir. 1999). "The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." Id. at 1311-1312 (III) (C) (1) (b). Nevertheless,

> a trial court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury. Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Emory Univ.*, 355 Ga. App. at 543-544 (1) (citation and punctuation omitted). In that vein, "[c]ases arise where it is very much a matter of discretion with the court whether

11

to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous." *Allison*, 184 F3d at 1306 (II) (citation and punctuation omitted). Finally, we note that "causation may be established by linking the testimony of several different experts," and "questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable, and undisputed cases." *Swint*, 348 Ga. App. at 206 (2) (citations and punctuation omitted); see also generally *Aleman v. Sugarloaf Dialysis*, 312 Ga. App. 658, 661-663 (2) (719 SE2d 551) (2011) (a medical expert's testimony as to causation, when combined with other evidence, was sufficient to preclude summary judgment in a malpractice claim).

Dr. DeSimone is board-certified in obstetrics-gynecology and gynecologic oncology, a professor of gynecologic oncology, and a board examiner for the American Board of Obstetrics and Gynecology. He has practiced for over 20 years, trains medical students in obstetrics-gynecology and gynecologic oncology, and has published extensively in his fields. Dr. DeSimone testified at trial that Debbie's adnexal mass likely measured 8-10 centimeters by the time she gave birth and that, because the mass had not yet ruptured, her cancer likely had not progressed beyond stage 1 at that time. He also acknowledged that Debbie suffered from a rare form of cancer for which less data is available than other types of cancer. For that reason, it

12

is his practice when treating such patients to use "epithelial ovarian cancer as a whole" — a broader classification that includes squamous cell cancer — as a basis for prognoses, which is a common practice among gynecological oncologists. And based on that data, he testified, the 5-year survival rate for stage 1 patients is approximately 85-90 percent.[10] Dr. DeSimone further noted that a 2016 study of data from the National Cancer Institute's Surveillance Epidemiology and End Results database — which focused on ovarian squamous cell carcinoma — similarly reported an 87 percent 5-year survival rate for stage 1 patients.

Dr. DeSimone also testified that he personally had treated four patients with the same type of rare cancer as Debbie. Two of them (one diagnosed at stage 1 and the other at stage 3) died within a year, another (diagnosed at stage 2) survived for more than three years and was still alive, and the fourth (also diagnosed at stage 2) also was still alive following treatment approximately nine years earlier.

The trial court did not abuse its discretion by admitting Dr. DeSimone's opinions, which were but one link in a chain of evidence supporting Jason's theory of causation. Both the relevance and reliability of Dr. DeSimone's opinions as to

---

[10] A five-year survival rate is a common data point for cancer survivability because if a cancer has not recurred for five years, it has a low likelihood of recurring.

causation were supported by (and consistent with) multiple medical journal articles addressing ovarian squamous cell carcinoma (submitted with Jason's motion for reconsideration), which identified the 5-year survival rate for stage 1 patients as ranging from 75.7 to 95 percent. And at trial, the testimony of Drs. Quirk, McBroom, and Grisham provided additional support for both the relevance and reliability of the bases for Dr. DeSimone's opinions as to causation, as each witness testified that Debbie's prognosis worsened as a result of the failure to treat her adnexal mass earlier. It therefore was within the trial court's discretion to determine that (i) the significant corroboration of Dr. DeSimone's opinions from other sources was sufficient to overcome the concerns raised by the appellants as to Dr. DeSimone's use of extrapolation and the limits of his clinical experience and reliance on relevant literature; and (ii) "any alleged deficiencies in the bases for his opinion[s] would go to both the credibility of [Dr. DeSimone's] testimony and any weight a jury might wish to assign to it." *Swint*, 348 Ga. App. at 208 (2); see also *Kumho Tire Co.*, 526 U. S. at 152 (II) (C) (the abuse-of-discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion"). We therefore affirm the denial of the appellants' motion to exclude his testimony.

14

2. The jury awarded Jason $1,013,226.60 for past medical expenses; $6,956 for funeral and burial expenses; $7,000,000 for Debbie's past non-economic damages, including physical, mental, and emotional pain, injury, suffering, inconvenience, and physical impairment; $500,000 for loss of consortium; and $0 for Debbie's wrongful death. The appellants contend that the jury's verdict is impermissibly inconsistent because it awarded damages for funeral and burial expenses but not for wrongful death. We disagree.

"In a civil case, a verdict that is contradictory and repugnant is void, and no valid judgment can be entered thereon. A judgment entered on such a verdict will be set aside." *Anthony v. Gator Cochran Constr.*, 288 Ga. 79, 79 (702 SE2d 139) (2010) (citation and punctuation omitted). Nevertheless, under OCGA § 9-12-4, "[v]erdicts shall have a reasonable intendment and shall receive a reasonable construction. They shall not be avoided unless from necessity." "Thus, the presumptions are in favor of the validity of verdicts, and if possible a construction will be given which will uphold them. Even if the verdict is ambiguous and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied." *Anthony*, 288 Ga. at 80-81 (citation and punctuation omitted); see also OCGA § 51-12-12 (a) ("The question of damages is ordinarily one for the jury;

15

and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case."); *Rockdale Hosp. v. Evans*, 306 Ga. 847, 851 (2) (a) (834 SE2d 77) (2019) ("[T]he trial court's approval of the verdict creates a presumption of correctness which is not to be disturbed absent compelling evidence.") (citation and punctuation omitted). "The burden is upon the party attacking a verdict to show its invalidity." *Zurich American Ins. Co. v. Bruce*, 193 Ga. App. 804, 804 (1) (388 SE2d 923) (1989) (citation and punctuation omitted).

The appellants rely primarily on *Bunch v. Mathieson Drive Apartments*, 220 Ga. App. 855 (470 SE2d 895) (1996), in which we concluded that the jury's verdict awarding zero damages for wrongful death and $7,050 for funeral expenses was "inherently inconsistent and ambiguous" and required a new trial. Id. at 855-856, 857-859 (1); see *Gay v. Piggly Wiggly Southern*, 183 Ga. App. 175, 180-181 (2)-(3) (358 SE2d 468) (1987) (the statutory provision authorizing an award of funeral expenses "is a true wrongful death provision," and a claim for such expenses is "dependent upon the fact of [the decedent's] death" and results from the injury to the decedent's representative for the decedent's wrongful death). In *Bunch*, the decedent, Starlyn Pettis, died from smoke inhalation as a result of a fire in her apartment. 220

16

Ga. App. at 855. Her mother, Sandra Bunch, sued the apartment complex, alleging that Pettis's death resulted from the defendant's failure to furnish her apartment with a smoke detector. Id. At trial, a jury awarded Bunch $0 for Pettis's death, but $7,050 for funeral expenses. Id. at 856. On appeal, we reversed and remanded for a new trial on liability and damages, concluding that the jury's verdict was void because it was inexplicably "contradictory and irreconcilable." Id. at 858-860 (1)-(2).

*Bunch* is distinguishable because there was no evidence in that case that, but for the apartment fire, Pettis likely would have died when she did or within a short time thereafter, as a result of which we did not address whether Bunch simply may have failed to meet her burden of proving damages attributable to the wrongful death claim. On the peculiar facts of this case, however, the jury reasonably could have found that, while the defendants' negligence was the immediate cause of Debbie's death (thus justifying the award of funeral expenses, see *Gay*, 183 Ga. App. at 179-181 (2)-(3)), Jason did not meet his burden as the plaintiff of establishing by a preponderance of the evidence a meaningful, reasonable monetary value for the jury to award as damages on his wrongful death claim, given the sharply conflicting evidence that was presented as to Debbie's life expectancy. See OCGA § 51-4-2 (a) (the measure of damages for wrongful death is "the full value of the life of the

17

decedent, as shown by the evidence"); *Cox Interior v. Bayland Properties*, 293 Ga. App. 612, 613 (1) (667 SE2d 452) (2008) ("The plaintiff in a civil matter has the ultimate burden of proving its case by a preponderance of the evidence."); see also *White v. State*, 307 Ga. 601, 607 (3) (b) (837 SE2d 838) (2020) ("Proof by a preponderance . . . requires that the evidence show that something is more likely true than not."). Indeed, a defense expert testified that Debbie's cancer "has an extraordinarily high fatality rate" and that Debbie's survivability likely would not have changed if the mass had been removed when she gave birth. The defendants highlighted that point during closing arguments, asserting that, even if Debbie's cancer had been diagnosed earlier, "she did not have . . . a long life of survivability for her." And even Dr. DeSimone acknowledged that only limited data is available as to the survivability of Debbie's rare form of cancer.

Moreover, the appellants' assertions that "the verdict in favor of the Appellants on the wrongful death claim established that the Appellants were not liable for Debbie Sain's death" and that "the jury expressly found that the Appellants did not cause the death of Debbie Sain" each misread the verdict form. Notably, the first page of the verdict form indicates that the jury found "in favor of" "Plaintiffs against" PWH and Drs. Dickerson and Long. The second page of the verdict form first

18

instructed the jury to assign a monetary value to each category of damages sought. The form then instructed the jury to "determine the percentage of fault for each" defendant that the jury "found to be negligent," in response to which the jury entered "40%" in the spaces next to PWH and Dr. Dickerson and "20%" in the space next to Dr. Long.

The verdict form therefore does not unequivocally establish that the jury found "in favor of the Appellants" on Jason's wrongful death claim. Rather, when viewed in light of the conflicting evidence of Debbie's life expectancy and the jury's affirmative findings that the appellants were negligent, the more reasonable reading of the verdict as a whole — even if it arguably may be ambiguous — is that the jury found against the appellants on the wrongful death claim, but also found that Jason did not meet his burden of establishing a reasonable, meaningful amount of damages on that claim.[11] Because the jury's verdict is susceptible of a construction that

[11] To the extent that the appellants implicitly complain that the verdict *form* resulted in a verdict that is susceptible to more than one construction, the time to address that issue was before they agreed on the form's structure. See *Moody v. Dykes*, 269 Ga. 217, 221 (5) (496 SE2d 907) (1998) (rejecting challenge to structure of special verdict form because it was raised for the first time on appeal); *Parks v. Breedlove*, 241 Ga. App. 72, 75 (2) (526 SE2d 137) (1999) (the failure to object in the trial court to a verdict form that results in an ambiguous verdict waives any such challenge on appeal).

resolves any ambiguities, we affirm the trial court's judgment. See *Anthony*, 288 Ga. at 80-81.

*Judgment affirmed. Doyle, P. J., and Gobeil, J., concur fully as to Division One, and concur in judgment only as to Division Two.*