**THIRD DIVISION
DOYLE, P. J.,
GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**September 6, 2023**

# In the Court of Appeals of Georgia

A23A0735. HUMPHREY et al v. THE EMORY CLINIC, INC. et al.

GOBEIL, Judge.

Following the grant of her application for interlocutory review, Maisha K. Humphrey, individually and as the representative of the Estate of Ronald Glenn Humphrey, II ("Plaintiff"),[1] appeals from three trial court orders excluding certain of her experts' opinion testimony under OCGA § 24-7-702 in this underlying medical malpractice action. In the instant appeal, Plaintiff contends that the trial court erred in excluding the expert opinions offered by Lisa Fowlkes, M. D. (as to standard of care and causation) and Cynthia Cooper, M. D. (as to "general" causation opinions) with respect to certain treating physicians involved in her husband's care. For the reasons that follow, we now affirm.

---

[1] Plaintiff is Ronald Glenn Humphrey, II's widow.

"Whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." *Aguilar v. Children's Healthcare of Atlanta*, 320 Ga. App. 663, 664 (739 SE2d 392) (2013) (citation and punctuation omitted). Separate from a trial court's determination on an expert's qualifications, the party proffering an expert "bears the burden of presenting evidence of reliability in order to meet the standards of OCGA § 24-7-702 (b)." *Hart v. Phung*, 364 Ga. App. 399, 406 (1) (876 SE2d 1) (2022) (citation and punctuation omitted). The trial court's determination of an expert's reliability "is a legal determination . . . and will not be disturbed absent a manifest abuse of discretion." Id. (citation and punctuation omitted).

The record shows that on December 8, 2018, Ronald Glenn Humphrey, II ("Humphrey"), having just returned from a trip to Benin in Africa, suspected he may have contracted malaria and went to Emory St. Joseph's Emergency Room presenting with a headache, fever, chills, and body aches. Tests confirmed that he did have malaria.[2]

---

[2] According to the Centers for Disease Control and Prevention ("CDC"), common symptoms of uncomplicated malaria include fever, chills, sweating, headache, fatigue, myalgia, cough, nausea, and mild anemia. If untreated, uncomplicated malaria can progress to severe malaria, which may be defined as a case of malaria with one or more of the following manifestations: neurologic symptoms,

On the evening of December 8, the emergency department at Emory St. Joseph's consulted by phone with Juliana da Silva, M. D., an infectious disease specialist, who ordered an oral antimalarial medication (Coartem) for Humphrey. Humphrey was admitted to the hospital for further observation and treatment and his condition was described as "[s]table" at that time. The following day, December 9, Dr. da Silva responded to a call for the infectious disease department to formally consult on Humphrey's case. After examining Humphrey, Dr. da Silva agreed with the prior diagnosis of uncomplicated malaria because Humphrey "[did] not meet any of the criteria for severe malaria." Although Dr. da Silva did not change Humphrey's treatment course, she "cut and pasted" the criteria for severe malaria from the CDC's website into his chart.

That same morning, December 9, Humphrey came under the care of Laura Booth, M. D., the attending hospitalist. Dr. Booth reviewed Dr. da Silva's notes to educate herself about the criteria for severe malaria. Dr. Booth ordered additional blood labs to be drawn, which showed worsening kidney and liver function. Dr. Booth did not specifically relay the test results to Dr. da Silva, reasoning that a

acute kidney injury, severe anemia, acute respiratory distress syndrome, or jaundice. In general, uncomplicated malaria is usually treated with an oral antimalarial medication, while severe malaria is frequently treated with intravenous medications.

3

consulting physician "follows along" with his or her patient's progress, and "everyone sees the labs, and [she] usually only call[s] if there's an acute clinical change." Later that afternoon, Humphrey experienced several episodes of hypotension. Dr. Booth ordered fluids, which increased Humphrey's blood pressure, but again did not notify Dr. da Silva of this development.

The next day, Humphrey's condition continued to worsen and he was transferred to the Intensive Care Unit on the afternoon of December 10, 2018. Dr. Booth ultimately called the infectious disease department to consult. James McMillen, M. D. responded and noted an "[i]mpression and [p]lan" for severe malaria based on kidney failure. Humphrey never received intravenous antimalarial medications. On December 11, 2018, Humphrey died of multi organ failure at Emory St. Joseph's.

In November 2019, Plaintiff filed a medical malpractice/wrongful death lawsuit against The Emory Clinic, Inc. ("Emory"), Dr. Booth, Dr. da Silva, Dr. McMillen, and Atlanta Clinical Care, P. C. ("ACC").[3] As relevant to this appeal, Plaintiff provided

---

[3] During the time period at issue, Emory employed Dr. Booth, while both Drs. da Silva and McMillen were employed by ACC.

4

expert affidavits and opinions from two hospitalists, Dr. Fowlkes and Dr. Cooper, as to the applicable standard of care and causation issues.[4]

*Dr. Fowlkes's opinions as to Dr. Booth:* Dr. Fowlkes, a hospitalist, is board-certified in internal medicine. By her own admission, she is not an infectious disease specialist or malaria expert. She has never treated anyone diagnosed with severe malaria and has never taught about malaria or severe malaria. In formulating her opinions in this matter, Dr. Fowlkes reviewed the case file, including the pleadings, medical records, autopsy report, death certificate, literature published by the CDC and the World Health Organization, pharmaceutical information on malaria medications, and other medical literature she obtained through her own research. Dr. Fowlkes opined that Dr. Booth deviated from the standard of care applicable to hospitalists by failing to: (1) notify Dr. da Silva that Humphrey's daily lab results had been returned on December 9; (2) notify Dr. da Silva that Humphrey had an episode of hypotension that resolved with administration of intravenous solutions on the afternoon of

---

[4] Plaintiff also relied on Stephen Thomas, M. D., an infectious disease specialist, as an expert. Emory and Dr. Booth filed a joint motion to exclude Dr. Thomas's expert testimony, which the trial court denied, finding that Dr. Thomas was qualified to offer standard of care and causation opinions as to Dr. Booth, and that Dr. Thomas's standard of care and causation opinions were the product of sufficiently reliable methodology and admissible under OCGA § 24-7-702 (b).

December 9; (3) diagnose Humphrey with severe malaria on December 9; (4) treat or ensure treatment for severe malaria on December 9; (5) notify Dr. McMillen that Humphrey's daily lab results had been returned on December 10; and (6) treat or ensure treatment for severe malaria on December 10. Dr. Fowlkes also offered causation testimony. Specifically, Dr. Fowlkes opined to a reasonable degree of medical probability or certainty that Humphrey more likely than not would have survived his illness had he timely received intravenous antimalarial medication before midnight on December 10.

*Dr. Fowlkes's opinions as to Dr. da Silva and Dr. McMillen*: Dr. Fowlkes opined that Dr. da Silva and Dr. McMillen deviated from the standard of care by failing to check Humphrey's labs, timely diagnose him with severe malaria, and to timely initiate intravenous antimalarial medication. Again, Dr. Fowlkes opined that these failures caused Humphrey's death which she found was otherwise preventable by the timely administration of the recommended intravenous antimalarial medication.

*Dr. Cooper's opinions as to Dr. Booth*: Dr. Cooper, a board-certified internal medicine physician, has spent the last 15 years working as a hospitalist. Dr. Cooper

is not an infectious disease specialist or an expert on malaria. Like Dr. Fowlkes, Dr. Cooper reviewed the case file, including the pleadings, medical records, autopsy report, death certificate, and literature published by the CDC in formulating her opinions in this matter. Dr. Cooper opined that Dr. Booth deviated from the standard of care applicable to hospitalists by failing to: (1) notify Dr. da Silva that Humphrey's daily lab results had been returned on December 9; (2) notify Dr. da Silva that Humphrey had an episode of hypotension that resolved with administration of intravenous solutions on the afternoon of December 9; and (3) notify Dr. McMillen that Humphrey's daily lab results had been returned on December 10. Dr. Cooper offered limited testimony on the efficacy of antiviral medications. However, Dr. Cooper could not opine to a reasonable degree of medical probability or certainty whether Dr. Booth's alleged failure to call Dr. da Silva on December 9, or call Dr. McMillen on December 10, impacted Humphrey's care or outcome.

Emory and Dr. Booth filed joint motions to exclude the expert testimony of Dr. Fowlkes and Dr. Cooper. Dr. da Silva filed a motion to exclude the testimony of Dr. Fowlkes. In addition, Dr. McMillen and ACC filed a joint motion to exclude the testimony of Dr. Fowlkes.

7

Following a hearing on September 29, 2022, the trial court addressed the defendants' motions in three separate orders. As to Emory and Booth's motions, the trial court found that Dr. Fowlkes's and Dr. Cooper's standard of care opinions were the product of sufficiently reliable methodology and admissible under OCGA § 24-7-702 (b).[5] However, the court found that Dr. Fowlkes and Dr. Cooper were not qualified under OCGA § 24-7-702 (c) (2) to offer causation opinions as to Dr. Booth because both doctors were "without the requisite actual professional knowledge and experience to offer any of [their] proffered causation opinions." More specifically, the court highlighted that in the course of Dr. Fowlkes's practice as a hospitalist, she had never diagnosed or treated a patient with severe malaria, and thus, she lacked "actual professional knowledge and experience to provide her proposed causation opinions, including but not limited to those as to the efficacy of antimalarial medications and [Humphrey's] ability to survive his illness if different antimalarial medications had been provided." The court made similar findings with respect to Dr. Cooper, and also noted that Dr. Cooper herself agreed that she did not have the background, experience, education, and training to offer an opinion as to whether

---

[5] The trial court also found that Dr. Fowlkes was qualified under OCGA § 24-7-702 (c) (1) & (2) to offer standard of care opinions as to Dr. Booth.

8

there would have been a different outcome in Humphrey's case if he had been prescribed or received different antimalarial medications. Further, the court found that Dr. Fowlkes's and Dr. Cooper's causation opinions were not based on reliable methodology as required by OCGA § 24-7-702 (b). Thus, the trial court granted in part (as to causation) and denied in part (as to standard of care) Dr. Booth's and Emory's joint motions to exclude Dr. Fowlkes's and Dr. Cooper's expert opinions.

Turning to Dr. da Silva's and Dr. McMillen's motions to exclude, the trial court found that Dr. Fowlkes's opinions did not demonstrate actual professional knowledge and experience or active practice or teaching as required under OCGA § 24-7-702 (c) (2) (A) and (B). In support, the court highlighted that "Dr. Fowlkes admitted that she has never taught about malaria or severe malaria," that she had "not treated anyone with uncomplicated malaria since, perhaps, her residency training, nearly 30 years ago," and that "had she been caring for [Humphrey]," she "would have consulted an infectious disease specialist for assistance." Thus, the trial court granted both Dr. da Silva's motion and also Dr. McMillen's and ACC's motion to exclude Dr. Fowlkes's opinions as to standard of care or related causation opinions regarding Dr. da Silva and Dr. McMillen.

9

The trial court certified its decisions for immediate review, and we subsequently granted Plaintiff's application for interlocutory appeal. This appeal followed.

On appeal, Plaintiff argues that the trial court abused its discretion in excluding: (1) the causation opinions of Dr. Fowlkes as to Dr. Booth, Dr. da Silva, and Dr. McMillen; (2) the "general" causation opinion of Dr. Cooper as to Dr. Booth; and, (3) the standard of care opinions of Dr. Fowlkes as to Drs. da Silva and McMillen.

OCGA § 24-7-702[6] governs the admissibility of opinion testimony by expert witnesses in civil cases, including cases involving professional malpractice. See *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015). The general standard for the admissibility of such testimony is found in OCGA § 24-7-702 (b) (2022), which provides:

---

[6] OCGA § 24-7-702 was amended in 2022. See Ga. L. 2022, pp. 201-202, §§ 1, 4. Because the trial court held a hearing on the motions filed by the respective defendants on September 29, 2022, the current version of the statute, which became effective on July 1, 2022, applies here. See Ga. L. 2022, p. 202, § 3 ("This Act shall become effective on July 1, 2022, and shall apply to any motion made or hearing or trial commenced on or after that date.").

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based upon sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

This standard is based upon Federal Rule of Evidence 702, see *Mason v. Home Depot U.S.A.*, 283 Ga. 271, 279 (5) (658 SE2d 603) (2008), and it requires a trial court to sit "as a gatekeeper and assess the reliability of proposed expert testimony," *An v. Active Pest Control South*, 313 Ga. App. 110, 115 (720 SE2d 222) (2011), applying the principles identified in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny. See OCGA § 24-7-702 (f) (2013).

OCGA § 24-7-702 (c) (2022) sets forth an additional requirement for the admission of expert testimony about the applicable standard of conduct in all professional malpractice cases, including medical malpractice cases. See *Hankla v. Postell*, 293 Ga. 692, 696 (749 SE2d 726) (2013). In a professional malpractice case,

> the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:
>
> (1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time[.]

OCGA § 24-7-702 (c) (1) (2022).

For medical malpractice cases in particular, OCGA § 24-7-702 (c) (2) (2022) sets out still more requirements for the admission of expert testimony about the standard of conduct. Specifically, this subsection requires in relevant part that an expert have

actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue[.]

OCGA § 24-7-702 (c) (2) (2022). In addition, an expert in a medical malpractice case must be "a member of the same profession" as the defendant about whose alleged malpractice the expert will testify. OCGA § 24-7-702 (c) (2) (C) (i) (2022).

1. Plaintiff contends that the trial court erred in basing the exclusion of both Dr. Fowlkes's and Dr. Cooper's causation testimony on OCGA § 24-7-702 (c) because

13

that subsection only applies to standard of care opinions. Specifically, Plaintiff asserts that "Georgia's 'three of five years' hurdle for medical experts," found at OCGA § 24-7-702 (c) applies only to experts opining on the standard of care, and not to testimony on causation.

We need not decide whether the trial court erred in excluding both Dr. Fowlkes's and Dr. Cooper's causation testimony based on OCGA § 24-7-702 (c)[7] because we affirm on the trial court's alternate basis for exclusion: that Dr. Fowlkes's and Dr. Cooper's causation opinions were not the product of a reliable methodology, pursuant to OCGA § 24-7-702 (b).

> Reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential

---

[7] Our case law has yet to address a situation in which OCGA § 24-7-702 (c) has been applied specifically to exclude causation opinions. We have stated that "[t]he plain language of OCGA § 24-9-67.1 (c) [the predecessor to OCGA § 24-7-702 (c)] applies to experts testifying about the 'standard of conduct' in professional malpractice actions." *Hankla v. Jackson*, 305 Ga. App. 391, 396 (2) (b) (699 SE2d 610) (2010). Additionally, although not binding authority, a federal district court in Georgia has held that "the requirements of OCGA § 24-7-702 (c) do not apply to causation testimony." *Callaway v. O'Connell*, 44 FSupp.3d 1316, 1324 (II) (B) (M. D. Ga. 2014), citing *Bonds v. Nesbitt*, 322 Ga. App. 852, 857-859 (3) (747 SE2d 40) (2013), overruled on other grounds by *Russell v. Kantamneni*, 363 Ga. App. 899, 904-905 (873 SE2d 458) (2022) (expert could testify as a causation expert, but was not qualified to give standard of care opinions under OCGA § 24-7-702 (c)).

14

rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

*Smith v. Braswell*, 342 Ga. App. 700, 701 (1) (804 SE2d 709) (2017) (citation and punctuation omitted). But because "the test of reliability is a flexible one, the specific factors neither necessarily nor exclusively apply[ ] to all experts in every case." Id. at 702 (1) (citation and punctuation omitted). Put another way, a trial court's "broad discretion in deciding how to assess the reliability of expert testimony" affords the court "considerable leeway in deciding which tests or factors to use to assess the reliability of an expert's methodology." *Smith v. CSX Transp.*, 343 Ga. App. 508, 512 (1) (b) (806 SE2d 890) (2017) (citations and punctuation omitted); accord *Kumho Tire Co., Ltd. v. Carmichael*, 526 U. S. 137, 142 (119 SCt 1167, 143 LE2d 238) (1999) (the law grants a trial court "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination") (emphasis in original). Importantly, "the proponent of the testimony does not have the burden of proving that it is scientifically correct, but [only] that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Med. Corp.*, 184 F3d 1300, 1312 (III) (C) (1) (b) (1) (11th Cir. 1999). "The judge's role is to keep unreliable and

15

irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." Id. at 1311-1312 (III) (C) (1) (b).

As to Dr. Fowlkes, the trial court reasoned that Dr. Fowlkes's methodology was deficient because she "did not undertake to review any peer-reviewed literature or any adequate study of the diagnosis and treatment of malaria to acquire expertise sufficient to provide a foundation for her causation opinions." In fact, Dr. Fowlkes admitted that she did not read any published scientific studies to support her opinions regarding malaria medications. Rather, she obtained most of her information from Internet searches. See *Webster v. Desai*, 305 Ga. App. 234, 235-237 (1) (699 SE2d 419) (2010) (trial court did not abuse its discretion in concluding expert witness was not qualified to testify in conservator's medical malpractice action, or that expert's testimony regarding causation was not the product of reliable principles and methods, where expert performed no case studies, statistical analysis, or epidemiological studies; rather, expert's "knowledge regarding the subject comes entirely from his professional reading, not from his laboratory research"). Under these circumstances, the trial court did not err in excluding Dr. Fowlkes's causation opinion under OCGA § 24-7-702 (b).

Next, the trial court also excluded Dr. Cooper's proffered causation opinions under OCGA § 24-7-702 (b), noting that her opinions were not the product of reliable methodology. On appeal, Plaintiff contends that "[i]t is not 'unreliable' to profess a lack of an opinion on a subject, and the trial court simply misread the governing law and relevant portions of [Dr.] Cooper's opinion testimony." However, that is the extent of her argument on this issue. See *Kramer v. Yokely*, 291 Ga. App. 375, 383 (3) (662 SE2d 208) (2008) ("an appellant must support enumerations of error with argument and citations of authority, and mere conclusory statements are not the type of meaningful argument contemplated by" our rules) (citation and punctuation omitted).

Plaintiff also broadly asserts that the trial court erred in excluding Dr. Cooper's "general" causation opinions[8] — "that is, that IV malarial drugs are generally highly effective at reducing mortality in severe malaria cases." In the first instance, Dr. Cooper did not offer an opinion on the efficacy of intravenous anti-malarial

---

[8] Typically, "general causation" opinions are relevant in toxic tort cases. See *Ga. Power Co. v. Campbell*, 360 Ga. App. 422, 427 (2) (861 SE2d 255) (2021) ("a plaintiff [in a toxic tort case] must offer proof of general causation — that exposure to a substance is capable of causing a particular injury or disease — and proof of specific causation — that exposure to a substance under the circumstances of the case contributed to his illness or disease") (citation and punctuation omitted).

17

medications; rather, she noted the difference in treatment options between uncomplicated malaria and severe malaria — stating "that severe malaria gets treated differently, and so that if you treat severe malaria with the treatment that is only for malaria that's uncomplicated, the outcomes are going to be worse than they would be if you had treated with specific medications for severe malaria." As noted by the trial court in its order excluding Dr. Cooper's causation testimony, Dr. Cooper did not offer an opinion to a reasonable degree of medical probability or certainty whether Dr. Booth's alleged failure to call Dr. da Silva on December 9, or Dr. McMillen on December 10, impacted Humphrey's chance of survival. Plaintiff thus necessarily has failed to show how Dr. Cooper's testimony would have assisted the trier of fact on this contested issue. See *Preferred Women's Healthcare LLC v. Sain*, __ Ga. App. __, __ (1) (__ SE2d __ 2023) (Case No. A23A0413, May 31, 2023) ("An expert opinion is relevant if it will assist the trier of fact to understand the evidence or to determine a fact in issue.") (citation and punctuation omitted).

Importantly, Dr. Cooper admitted in her deposition that she was not familiar with the criteria for the diagnosis of severe malaria before she undertook a review of Humphrey's medical records. Dr. Cooper also conceded that she did not have the background, experience, education, and training to offer an opinion as to whether or

18

not the timely administration of different antimalarial medications would have resulted in a different outcome in the instant case. And, she expressly noted that she would "defer to infectious disease [doctors]" on the appropriate course of treatment. Based on the foregoing, the trial court did not abuse its discretion in excluding Dr. Cooper's causation opinions pursuant to OCGA § 24-7-702 (b).

2. Plaintiff also argues that the trial court abused its discretion in excluding Dr. Fowlkes's standard of care opinions as to the infectious disease doctors, Dr. da Silva and Dr. McMillen. She asserts that a doctor does not need to practice in the same subspeciality as another to offer an opinion on standard of care. She also highlights that even though Dr. Fowlkes has never diagnosed or treated a malaria patient, neither of the infectious diseases doctors nor Dr. Booth had any meaningful experience in dealing with a case of severe malaria, which is "ultra-rare" in the United States.

To determine whether an expert is qualified under OCGA § 24-7-702 (c), Georgia courts examine "both the area of specialty at issue and what procedure or treatment was alleged to have been negligently performed[.]" *Orr v. SSC Atlanta Operating Co.*, 360 Ga. App. 702, 704-705 (1) (860 SE2d 217) (2021) (citation and punctuation omitted). As noted by the trial court, Dr. Fowlkes, a hospitalist, "acknowledged that infectious disease specialists have additional training that she

19

does not have," and that she "has never taught about malaria or severe malaria," nor has she ever "treated anyone diagnosed with severe malaria." Importantly, as Dr. Fowlkes herself admitted, "she would not feel comfortable giving expert opinions on malaria, severe malaria, or the diagnosis and treatment of either, without researching these issues as part of her review of this case," and thus, she "had no independent basis for her opinions and relied on assumptions made at the time of her review."

Plaintiff counters that Dr. Fowlkes routinely encounters assessment and diagnostic issues in her clinical practice as a hospitalist, and therefore, was qualified to offer an opinion as to whether Drs. da Silva and McMillen exhibited conduct consistent with the requisite standard of care in performing these functions in the instant case. However, while the evidence might show that Dr. Fowlkes is generally qualified to opine as to the acceptable standard of conduct of infectious disease doctors, "it is not sufficient that the expert have just a minimum level of knowledge in the area in which the opinion is to be given." *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007). Instead, "the issue is whether the expert has knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries." *Houston v. Phoebe Putney Mem. Hosp. Inc.*, 295 Ga. App. 674, 679 (1)

20

(673 SE2d 54) (2009) (citation and punctuation omitted). Here, given the absence of evidence or testimony concerning Dr. Fowlkes's care or management of malaria patients, as well as her own admission that she lacked the requisite training and experience of infectious disease specialists to diagnose and manage severe malaria before it becomes fatal, the trial court did not abuse its discretion in ruling that Dr. Fowlkes did not possess the necessary qualifications and expertise under OCGA § 24-7-702 (c) to render expert testimony as to Drs. da Silva and McMillen on the standard of care. See *Orr*, 360 Ga. App. at 706-707 (1) (b) (nurse lacked sufficient knowledge and experience to testify as expert on standard of care in rehabilitation facilities with regard to deep-vein thrombosis (DVT) prevention; even if nurse had sufficient experience to opine as to acceptable standard of care for nurses in general, nurse's curriculum vitae and deposition testimony did not suggest that nurse had requisite knowledge and experience with long-term management or care of rehabilitation patients at risk for DVT or give nurse experience or knowledge about DVT prevention).

Based on the foregoing, we affirm the trial court's orders excluding the causation opinions of Dr. Fowlkes as to Dr. Booth, Dr. da Silva, and Dr. McMillen; the "general" causation opinion of Dr. Cooper as to Dr. Booth; and, Dr. Fowlkes's

21

standard of care opinions as to the infectious disease doctors, Dr. da Silva and Dr. McMillen.

*Judgment affirmed. Doyle, P. J., and Senior Judge C. Andrew Fuller concur*.