A10A0556. WEBSTER v. DESAI et al.
(699 SE2d 419)

DOYLE, Judge.

Rohit Desai, M.D., administered Depo-Provera[1] to 15-year-old Kyia Andrews while she was pregnant with her son, Mekhii Andrews, who was born with limb reduction defects ("LRD").[2] Mekhii's great-grandmother and conservator, Juanita Webster, filed a medical malpractice action against Dr. Desai, Rohit M. Desai, M.D., P.C., and Stone Mountain Family Medicine (collectively, "Dr. Desai"), alleging that Dr. Desai's administration of the contraceptive caused Mekhii's LRD. Dr. Desai filed a motion to exclude the testimony of Webster's expert witness and a motion for summary judgment, and the trial court granted both motions. Webster appeals and, for reasons that follow, we affirm.

1. Webster contends that the trial court erred in granting Dr. Desai's motion to exclude the testimony of her expert witness, Dr. Robert F. Smith. We disagree.

Dr. Smith opines "within a reasonable degree of scientific certainty that Mekhii Andrews's limb defects were caused by his mother's ingestion of Provera during her very early pregnancy." In a thorough, well-reasoned opinion, the trial court concluded that Dr. Smith's testimony would be inadmissible at trial under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals*[3] and OCGA § 24-9-67.1 because (1) Dr. Smith was not qualified to provide an

---

[1] Depo-Provera is a contraceptive that contains the active chemical medroxyprogesterone acetate ("MPA").

[2] See *Daubert v. Merrell Dow Pharmaceuticals*, 43 F3d 1311, 1313 (I) (A), n. 1 (9th Cir. 1995) ("Limb reduction defects involve incomplete development of arms, legs, fingers and toes, such as the defects associated with the Thalidomide disaster of the 1960s.").

[3] 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993). See OCGA § 24-9-67.1 (f) (providing that "in interpreting and applying this Code section, the courts of this state may draw from the opinions of the United States Supreme Court in [*Daubert*; *Gen. Elec. Co. v. Joiner*, 522 U. S. 136 (118 SC 512, 139 LE2d 508) (1997); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U. S. 137 (119 SC

expert opinion in this case; (2) Dr. Smith was not qualified to render an expert opinion that Dr. Desai's administration of MPA caused Mekhii's LRD; and (3) Dr. Smith's conclusions were not the product of reliable methods.

"Whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion."[4] "A motion in limine is properly granted when there is no circumstance under which the evidence under scrutiny is likely to be admissible at trial. Applying the *Daubert* standard, expert testimony is admissible if it is both relevant and reliable."[5] Georgia law provides that expert testimony is admissible if:

> (1) [t]he testimony is based upon sufficient facts or data which are or will be admitted into evidence at the hearing or trial; (2) [t]he testimony is the product of reliable principles and methods; and (3) [t]he witness has applied the principles and methods reliably to the facts of the case.[6]

The *Daubert* Court listed the following noninclusive factors that courts should consider in determining reliability: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community."[7]

Dr. Smith is "a neuroscientist specializing in chemical effects on development." His curriculum vitae indicates that he has a Ph.D. in physiological psychology, with a minor in animal behavior, perception, and psychophysics. Dr. Smith is not a medical doctor, nor has he ever held a professional license. Although there is a board certification speciality available in medicine for teratology,[8] Dr. Smith does not hold any such certification.

Dr. Smith has never done any research or any other work studying the potential for a teratogenic agent to cause limb malfor-

---

1167, 143 LE2d 238) (1999)]; and other cases in federal courts applying the standards announced by the United States Supreme Court in these cases.").

[4] (Punctuation omitted.) *Mason v. Home Depot U.S.A.*, 283 Ga. 271, 279 (5) (658 SE2d 603) (2008).

[5] *Shiver v. Ga. & Florida Railnet*, 287 Ga. App. 828, 828-829 (1) (652 SE2d 819) (2007).

[6] OCGA § 24-9-67.1 (b) (1)-(3).

[7] *Allison v. McGhan Medical Corp.*, 184 F3d 1300, 1312 (III) (C) (1) (b) (1) (11th Cir. 1999).

[8] According to Dr. Smith, "[t]eratology originated as the study of birth defects, typically physical birth defects. It has expanded over the years to include the underlying mechanisms by which those birth defects are produced and functional birth defects such as defects resulting from central nervous system malformations."

mations, nor has he "published any materials that address the question of whether any chemical agent has the potential [to] caus[e] [LRDs]." Rather, Dr. Smith's knowledge regarding the subject comes "entirely from [his] professional reading, not from [his] laboratory research." The first time he ever reviewed literature regarding the link between progestins and LRDs was in preparation for serving as an expert witness in a case in 1998 and, although he "[keeps] up" with such literature, his only "general search" of the topic has been during his work as an expert.

Dr. Smith is unaware of any research study, article, or other published external source that "has found any increased statistical incidence or statistical correlation between the use of MPA and the incidence of [LRDs]." He agreed at deposition that "it is generally accepted in the scientific community that the causal relationship [between MPA and LRD] has not been sufficiently established. . . ." Instead, Dr. Smith relies on his own "retinoic acid HOX gene theory"; at deposition, Dr. Smith agreed with the following explanation of the theory: MPA is a type of progestin, which can interfere with biological receptors for retinoic acid, resulting in a change to HOX genes, which control skeletal development, and thus, he concludes that the "receptor interaction between progestins and retinoic acid and HOX genes . . . have the ability to cause limb anomalies." During his deposition, Dr. Smith deposed that the receptor interaction between progestin and retinoic acid HOX genes is established in scientific literature, but he also admits that he is not aware of any studies or peer review analysis concluding that MPA interacts with retinoic acid receptors and HOX genes. Dr. Smith also conceded that he was unaware "of any person on the planet other than [himself] who has ever . . . offered the opinion that[,] . . . based upon the receptor interaction between progestins and HOX genes, it is a scientifically valid conclusion to reach that progestins can cause limb reduction defects"; in fact, to Dr. Smith's knowledge, every researcher, physician, and scientist who has investigated whether MPA can cause LRD has concluded that it cannot. Finally, Dr. Smith agreed that he cannot rule out other possible explanations such as genetic defects for Mekhii's LRD because he is not qualified to do so.

Dr. Smith is aware that although the FDA previously required warnings on MPA regarding the potential for LRDs, it has since eliminated the requirement for such warnings after a review of available scientific data.[9] Similarly, the American College of Obstet-

---

[9] Dr. Smith was unable to answer deposition questions regarding specific FDA findings and warnings, testifying that he "[did not] follow FDA decisions" and that the FDA's actions were not "pertinent to [his] opinion."

rics and Gynecology has concluded that

> [t]he majority of recent studies . . . do not indicate a teratogenic effect, particularly insofar as cardiac anomalies and limb reduction defects are concerned when contraceptives are taken inadvertently during early pregnancy. Careful perusal of prospective cohort and case-control studies shows no substantive evidence of the teratogenicity of contraceptive steroids, including progestins in doses appropriate for contraception. . . .

Given this evidence, the trial court did not abuse its discretion in concluding that Dr. Smith was not qualified to testify in this case or that his testimony regarding causation was not "the product of reliable principles and methods."[10] Dr. Smith performed no case studies, statistical analysis, or epidemiological studies. Instead, he simply reviewed literature that concluded that MPA does *not* cause LRDs and, employing a theory that had no support or approval from any external source, concluded that MPA caused Mekhaii's LRD, despite that fact that he could not rule out other causes of the defects. Dr. Smith's opinion is contrary to all existing scientific data and is unsupported by any study, literature, or the opinion of any person. His opinion and theory have not been published or undergone peer review. Under these circumstances, the trial court did not err in excluding Dr. Smith's testimony.[11]

<div style="margin-left:2em; font-style:italic;">YALE LAW LIBRARY</div>

---

[10] OCGA § 24-9-67.1 (b) (2).

[11] See *Mason*, 283 Ga. at 279-280 (5) (trial court properly excluded the testimony of one expert based on "a lack of scientific support of her methods of determining causation" and a second expert who based his opinions solely on information he gleaned from plaintiffs' attorneys and from the internet); *Shiver*, 287 Ga. App. at 828-830 (1) (affirming exclusion of an expert who employed a differential diagnosis to establish causation and could not rule out other causes of plaintiff's symptoms); *Allison*, 184 F3d at 1316 (III) (C) (1) (b) (2) (affirming the exclusion of an expert witness whose "proffered conclusions in studies with questionable methodologies were out of sync with the conclusions in the overwhelming majority of the epidemiological studies presented to the court"); *Daubert*, 43 F3d at 1317-1322 (II) (C) (holding that experts' opinions that a nausea medication administered to the plaintiff during pregnancy caused her infant's LRD should be excluded where (1) they reached their conclusions only after they were hired to testify as expert witnesses; (2) the experts had not published their work nor had they solicited formal review by colleagues; (3) they could not adequately explain how they eliminated all other potential causes of birth defects; (4) the experts failed to demonstrate that their research was scientifically valid; and (5) the experts' testimony was not based on preexisting or independent research). But see *Dyson v. Winfield*, 113 FSupp.2d 44, 50-51 (II) (C) (D.C. 2000) (denying the defendant's motion to exclude the testimony of Dr. Robert Smith (the same expert in the instant case) that the administration of Provera caused numerous mental and physical birth defects in her infant son, including "severe muscular/skeletal anomalies"); *Ambrosini v. Labarraque,* 101 F3d 129, 131 (I) (D.C. Cir. 1996) (admitting the testimony of experts who concluded that the administration of Depo-Provera during the mother's pregnancy caused her daughter's multiple severe birth defects, "including facial and ear malformations, hearing loss due to middle ear abnormalities, eye and vertebral malforma-

2. Webster contends that the trial court erred by granting summary judgment to Dr. Desai. Again, we disagree.

"In a medical malpractice case, the plaintiff must present expert medical testimony establishing that the defendant's negligence either proximately caused or contributed to his injuries."[12] As set forth in Division 1, the trial court properly excluded Dr. Smith as an expert witness. And as the trial court concluded, "without Smith's testimony, there is nothing on the record in this case from which a jury could conclude that any of [d]efendants' actions caused the injuries [Webster] alleges."[13] Accordingly, the trial court did not err by granting Dr. Desai's motion for summary judgment.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED JULY 14, 2010 — ▮▮▮▮▮▮▮▮▮

*John G. Mabrey, Charles M. Cork III*, for appellant.
*Huff, Powell & Bailey, Randolph P. Powell, Jr., Erica S. Jansen*, for appellees.

---

tions, and cleft lip and palate").

[12] *Beasley v. Northside Hosp.*, 289 Ga. App. 685, 688 (658 SE2d 233) (2008).

[13] The trial court's order indicates that although Webster initially identified another expert witness, she indicated that she no longer intended to present his testimony after the defense sought to exclude it.