**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 7, 2023**

# In the Court of Appeals of Georgia

A23A0291. NATIONAL EMERGENCY MEDICAL SERVICES, INC. d/b/a NATIONAL EMS v. SMITH, et al.

A23A0469. SMITH, et al. v. NATIONAL EMERGENCY MEDICAL SERVICES, INC.

HODGES, Judge.

These appeals arise in a negligence action filed against National Emergency Medical Services, Inc. ("National EMS"), by the estate administrator and the husband of Hannah Smith (collectively, "Smith's Estate" or "the estate").[1] Smith died of a drug overdose in 2019 after her boyfriend made a 911 call to which National EMS responded. In Case No. A23A0291, we granted National EMS's application for interlocutory review of a trial court order that denies its motion to exclude testimony

---

[1] Caroline Smith is the estate administrator; the decedent's husband is Marcus Wallis.

from one of the estate's expert witnesses, and which also denies, in part, National EMS's motion for summary judgment on the estate's negligence claims. In Case No. A23A0469, Smith's Estate cross-appeals from the partial grant of National EMS's motion for summary judgment on the issues of punitive damages and attorney fees. The cases are consolidated for our review. For the reasons that follow, we reverse in Case No. A23A0291 and affirm in Case No. A23A0469.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant.

(Citations omitted.) *Herron v. Hollis*, 248 Ga. App. 194, 194-195 (546 SE2d 17) (2001).

> If a defendant who moves for summary judgment can point out by reference to the affidavits, depositions, and other evidence of record that there is no evidence sufficient to create a jury issue with respect to at least one essential element of the plaintiff's case, viewing all evidence and reasonable inferences therefrom in a light most favorable to the nonmoving party, without the necessity of weighing the evidence or

2

determining the credibility of the witnesses, such defendant is entitled to summary judgment unless the plaintiff can come forward with specific evidence giving rise to a triable issue.

(Citation omitted.) *Padgett v. Baxley and Appling County Hosp. Authority*, 321 Ga. App. 66, 69-70 (1) (741 SE2d 193) (2013).

At 3:38 a.m. on April 19, 2019, Athens-Clarke County Police Dispatch ("Police Dispatch") transferred a 911 call to National EMS dispatcher Ollie Bazemore. Police Dispatch remained on the line while the caller told Bazemore that his girlfriend was "dying in [his] bed" and "needs help." Then the call disconnected. The caller did not reveal the type or cause of the emergency, so Bazemore characterized it as an "unknown problem." Bazemore called the number back, but the call went to voicemail. Because the caller had stated that he did not know his location or address, Police Dispatch used GPS from the call to determine an address and told Bazemore that police were on the way.

Bazemore dispatched National EMS paramedic Josh Willard and emergency medical technician Jacob Hester. Willard deposed that at the time of dispatch, "there was no confirmed address, there was no confirmed patient, or patient information . . . [a]nd there was no contact with

3

the caller." Willard, Hester, and the police arrived at the scene around the same time, 3:52 a.m. Officer Jonathan Surine of the Athens-Clarke County Police Department came to the window of Willard and Hester's vehicle, which was stopped on the street at the bottom of the steep driveway leading up to the house, and said, "[W]e have history at this address. There's a lawyer that lives here that is very anti-public safety. So you need to stage here, we'll go up and figure out if something's going on, and we'll let you know." Willard deposed that he "took that as an order of you are to stage[,]" and that he typically follows police orders like this, which to him meant, "that you stay away from the scene at a safe distance . . . you don't approach the active scene until cleared to do so by law enforcement."

After telling National EMS to stage at the bottom of the driveway, Surine walked up the steep hill to the house. He deposed that he did not expect the EMS team to walk up the driveway and knock on the doors of the home themselves. He had firsthand knowledge of where in the house Smith lived because he had been there before, responding to a call about her. She was flagged by Police Dispatch records as a "10-96," meaning she had a "mental health flag." During that prior call, Smith had told Surine "not to bang [on the door] real hard if we ever came back out again . . .

4

or be loud, because . . . the rest of the house was where her father lived. And she said that he might get irritated."

Surine went to Smith's door at the back of the house and, over the course of several minutes, knocked five different times and stated, "Hannah, it's the Clarke County Police Department." Another police officer joined him partway through this process. Surine did not knock at the front door or carport side door. Surine's attempts to reach Smith were recorded on his body camera. He twice asked Police Dispatch to try to make phone contact and also shone his flashlight through a window, but further calls to the number got no response. He deposed that he did not observe any "exigent circumstance that would lead me to believe that somebody may have been in danger" to justify a forced entry.

After the second failed attempt at reaching the 911 caller by phone, Surine reported the incident as a "Status 2" – meaning an "unfounded complaint." He told Police Dispatch that he would "10-22" the National EMS team, meaning "quit/cancel, go back in service." He then began walking back down the driveway, where he met Willard, who had walked about two thirds of the way up the driveway to see what was causing the delay. The body camera recording shows Surine telling Willard, "Doesn't want to come to the door, so, let's get out of here." The recording ends at

5

this point. As Surine recalled in his deposition, "I told them that they could 10-22, which means go back, like disregard, cancel."

Willard deposed that the National EMS dispatcher told the crew that Police Dispatch "advised we could cancel" and that he told his dispatcher that the police officer on the scene also had given them a "verbal cancellation." Bazemore, the National EMS dispatcher, deposed that "when police say[] cancel, they, you know, did what they're supposed to do and we don't override PD[,]" and that while either an EMT or law enforcement may cancel a call, "if law enforcement is dispatched, it would be law enforcement." "We had to be told [by the 911 police dispatcher] to cancel the call, which we were, and the call was cancelled." Bazemore then talked to the National EMS team, telling them they "could cancel." About seven minutes elapsed between the time EMS arrived on the scene and the time that the call was cancelled, at 3:59 a.m.

Smith's boyfriend, Dustin Eddy, testified at the coroner's inquest that he and Smith went out to get beer about five times and "drank over a hundred beers that day. I know we did." On the night at issue, he testified, "out of the blue[,] . . . [she] poured a pile [of pills] in her hand and put them on her tongue and I begged her, don't swallow them. When she swallowed them, that's when I grabbed her phone off her

6

bed and called 911[.]" But, he testified, "she grabbed the phone from me, hung up on 911, told me no, they were – the police were not coming to her daddy's house. That was all I could do." Smith took the phone away from him and he did not know what happened to it. Eddy testified that because he was at Smith's house, "[s]he was kind of the boss. . . . She laid down. She explained to me that she had done this numerous times just to scare people. She had made it, it was no big deal. She laid down. I laid down." He did not hear the police arrive or knock on the door, he did not see lights, and he did not hear the phone ring again.

When Eddy woke the next morning, Smith's "body was really cold." He thought this was because the air conditioning was set to 60 degrees. He covered her up and shook her again. After a few minutes, when she did not wake up, at about 9:00 a.m., he called 911 again. The "Call for Service Report" for Eddy's call reports an "unresponsive female" and a "poss[ible] overdose," and that Eddy told 911 he had tried to call earlier but Smith "took the phone away from him and hid it; no emergency response was ever called for[.]" Senior Police Officer Shawn Denmark responded to the second 911 call, as did a different National EMS crew, whom he met at the bottom of the driveway because he knew it would be hard for them to find

7

Smith's door. When Denmark arrived, fire fighters were already on scene, performing CPR. Smith was pronounced dead at the scene.

The Georgia Bureau of Investigation's Division of Forensic Sciences autopsy report noted a contusion on Smith's lower abdomen, hypertensive cardiovascular disease, postmortem toxicology of "highly elevated concentrations of" Metoprolol and Fluoxetine,[2] and a "blood alcohol concentration of 0.223 grams per 100 mL." Her death was designated a "suicide."

*Case No. A23A0291*

1. National EMS argues that the trial court abused its discretion in denying its motion to exclude the opinions proffered by Smith's expert witness, James McCans. McCans provided deposition and affidavit testimony regarding the standard of care for paramedics and emergency medical technicians and whether, in his view, National

---

[2] Metoprolol is a medication for high blood pressure, and Fluoxetine is an antidepressant.

8

EMS violated that standard such that it breached a duty to Smith;[3] he also opined about negligent hiring and training. Because the trial court erred, we reverse.

"[W]hether expert testimony ought to be admitted under [OCGA § 24-7-702][4] is a question committed to the sound discretion of the trial court." *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016); see also *HTNB Ga., Inc. v. Hamilton-King*, 287 Ga. 641, 644 (1) (697 SE2d 770) (2010) (using "manifest abuse of discretion" standard to review trial court's ruling on admission or exclusion of expert testimony).

---

[3] See generally *Ketchup v. Howard*, 247 Ga. App. 54, 59 (2) (543 SE2d 371) (2000), overruled in part on other grounds by *Blotner v. Doreika*, 285 Ga. 481, 483-484 (1) (678 SE2d 80) (2009) ("Courts define and apply the legal duties professionals have to their patients and clients, but do not attempt to define standards of care. The recognized legal duty a medical professional owes to his or her patient is to exercise that degree of skill and care ordinarily employed by members of the same medical profession under the same or substantially similar circumstances. What that required level of skill and care actually is in any given case is a question of the standard of care recognized by the medical profession generally and must be proven through expert testimony.").

[4] OCGA § 24-7-702 was amended effective immediately following the issuance of the trial court's order in this case. This opinion references the version of the statute in effect at the time of the trial court's order, Laws 2011, Act 52, § 2, eff. January 1, 2013 to June 30, 2022.

While National EMS does not contest McCans' qualification as an expert,[5] it argued below and argues now on appeal, that his opinions were not the product of reliable principles and methods, were not reliably applied to the facts of the case, and were not based upon sufficient facts or data under OCGA § 24-7-702 (b) or the Supreme Court of the United States' decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993) (identifying certain factors relevant to determining the reliability of expert witness testimony). McCans' testimony was offered, in part, to establish a duty owed to Smith, a breach of that duty, and a causal connection between the behavior of the National EMS crew and Smith's injuries. A legal duty, of course, is an essential element of negligence, and the existence of a legal duty is a question of law for the trial court. *Boller v. Robert W. Woodruff Arts Center, Inc.*, 311 Ga. App. 693, 695-696 (1) (a) (716 SE2d 713) (2011).

---

[5] McCans is certified as a paramedic by the Pennsylvania Department of Health's Bureau of Emergency Medical Services and is certified as a Nationally Registered Paramedic with the National Registry of Emergency Medical Technicians; he is also certified as a flight paramedic by the International Board of Specialty Certifications through the International Association of Flight and Critical Care Paramedics. Among other things, he has worked for the FBI SWAT team and has responded to cases in Pennsylvania, New Jersey, New York, Delaware, Maryland and Virginia.

Under OCGA § 24-7-702 (b), "the testimony of a qualified expert is admissible if (1) it is 'based upon sufficient facts or data'; (2) it is 'the product of reliable principles and methods'; and (3) the expert witness 'has applied the principles and methods reliably to the facts of the case.'" (Citation omitted.) *Wilson v. Redmond Constr., Inc.*, 359 Ga. App. 814, 819 (860 SE2d 118) (2021), quoting OCGA § 24-7-702 (b). "Under OCGA § 24-7-702, it is the role of the trial court to act as a gatekeeper of expert testimony." *Yugueros v. Robles*, 300 Ga. 58, 67 (793 SE2d 42) (2016). In its exercise of this role, the trial court must "assess both the witness' qualifications to testify in a particular area of expertise and the relevancy and *reliability* of the proffered testimony." (Citation and punctuation omitted; emphasis supplied.) *Toyo Tire North America Mfg. v. Davis*, 299 Ga. 155, 160-161 (2) (787 SE2d 171) (2016). The Eleventh Circuit describes that assessment as a "rigorous three-part inquiry" in which the trial court considers

> whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;[6] and (3) the testimony assists the trier

---

[6] OCGA § 24-7-702 (f) provides that "[i]t is the intent of the legislature that, in all proceedings, the courts of the State of Georgia . . . in interpreting and applying this Code section, . . . may draw from the opinion of the United States Supreme Court

11

of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. While there is inevitably some overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them.

(Citations and punctuation omitted.) *United States v. Frazier*, 387 F3d 1244, 1260 (III) (A) (11th Cir. 2004). As noted above, McCans' qualification as an expert is not at issue.

Reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training. There are many different kinds of experts and many different kinds of expertise, and it follows that the test of reliability is a flexible one, the specific factors neither necessarily nor exclusively applying to all experts in every case.

---

in *Daubert* []; *General Electric Co. v. Joiner*, 522 U. S. 136 (1997); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U. S. 137 (1999); and other cases in federal courts applying the standards announced by the United State Supreme Court in these cases."

(Citation and punctuation omitted.) *HNTB Ga.*, 287 Ga. at 643 (1).[7] Smith's Estate

bore the burden of establishing the reliability of the expert's testimony. *Butler v.*

*Union Carbide Corp.*, 310 Ga. App. 21, 26 (1) (712 SE2d 537) (2011).

(a) National EMS does not dispute that it had a duty to respond to the 911 call,

which it did. Nor does National EMS dispute that it has a duty to treat a patient once

the patient is located. Rather, the question appears to be: When police independently

investigate the scene of a 911 call, then tell EMTs they may cancel their response

because no injured person is found or wants treatment, must emergency responders

make their own independent efforts to locate the injured person?[8] This is the question

upon which McCans opined. National EMS argues that McCans' opinions are

unreliable in identifying a standard of care in this scenario and, on that basis, in

---

[7] "[B]ecause OCGA § 24-7-702 is 'substantively identical' to its predecessor statute, former OCGA § 24-9-67.1, cases decided under the former statute [and prior to the January 1, 2013 effective date of Georgia's current Evidence Code], offer useful guidance when analyzing the current version of the statute." (Citation omitted.) *Dempsey v. Gwinnett Hosp. Sys.*, 330 Ga. App. 469, 471 (1) (a), n. 3 (765 SE2d 525) (2014).

[8] Or, in the words of the trial court, "the fact that EMS providers may cancel a response upon the direction of dispatch or law enforcement does not mean they should cancel . . . . Here, the question is whether the EMTs' *discretionary decision* to leave the scene violated a standard of care owed to Ms. Smith." (Emphasis supplied.)

13

opining about whether National EMS's behavior fell below any identified standard such that a breach of duty occurred. National EMS contends that McCans' lack of methodology and his failure to identify policies, procedures, training manuals or any other source setting forth an applicable standard regarding how EMTs must respond in the situation at issue here have rendered unreliable his opinions regarding any standard of care, duty, and its breach.

The trial judge's order pointed to McCans' affidavit, noting that McCans had identified a "national" standard of care. In his affidavit, McCans averred that because of his "education, training and experience, [he is] familiar with the standard of care that is applicable to paramedics, EMT, and EMS agencies across the country – including the duties of EMS crews and emergency responders in all aspects of responding to 911 emergency calls for service." The trial court also pointed to McCans' affidavit, in which he averred that the National EMS crew

> had a duty to make entry into the home to evaluate and assess the patient, with or without the cooperation of responding police officers . . . either by blanketing the house with light, sound, and repeatedly knocking on doors and windows to make their presence known, or by making forced entry themselves, by request for assistance from the fire department, or by contacting the officers' supervisor to obtain their cooperation. It was a breach of the standard of care for Hester and

14

Willard to cancel the call and leave the scene based solely upon the belief of a police officer[.]

Despite his testimony that there was a national standard of care *requiring* the paramedics to "make entry into the home," McCans also testified to the standard of care in Pennsylvania, where he works, saying, "in Pennsylvania an EMS provider *may cancel* a response when following the direction of the police or a dispatch center[,]" and that "in Pennsylvania law enforcement or fire department personnel on the scene *can indicate that no patient was found and can cancel responding EMS providers*." (Emphasis supplied.) The Pennsylvania Department of Health's "Basic Life Support Protocols" state that an EMS provider "may cancel a response" after being dispatched and not transport a patient when "following the *direction* of a PSAP[9] or dispatch center" and that reasons for such direction include "[w]hen law enforcement or fire department personnel on scene indicate that no incident or patient was found, these other public safety services may cancel responding EMS providers." (Emphasis supplied.)

---

[9] The acronym "PSAP" is not defined, and the parties point us to no definition in the record.

15

The trial court noted that McCans testified that Pennsylvania's policy "did not violate the standard of care," and found that the Pennsylvania rules "do not contradict or refute [McCans'] opinions concerning this case [because] the EMS providers in this case were not *ordered* to leave" (emphasis supplied); rather, they were told that they "could" cancel. The trial court found that the Pennsylvania rules were "discretionary" and would not "prohibit" EMS providers from continuing to search for a patient.[10]

Contrary to National EMS's arguments, the fact that McCans deposed that he did not rely on any treatises, articles, publications, textbooks, policies, procedures, training manuals, or other documents in forming his opinions on the standard of care is not dispositive in our reliability analysis. As our Supreme Court has determined, even where an expert has not cited "to any other publication, standard, statute, or regulation, federal or state, which set forth an industry standard[,] . . . [t]his is not to

---

[10] The trial court's order does not discuss how protocols which are explicitly discretionary can amount to a "standard of care" which may be violated when workers exercise the discretion specifically granted to them, nor how the lack of a prohibition on a particular action can amount to a duty to take that action. Further, although the trial court appears to apply the Pennsylvania standard to National EMS, the parties point us to nothing, nor do we find anything in the record, indicating that the Pennsylvania standard either applies in Georgia or is consistent with any national standard which may exist.

16

say that [an expert witness'] professional experience cannot provide some evidence of reliability, only that experience, standing alone, does not render reliable all opinions an expert may express." *HTNB Ga.*, 287 Ga. at 644-645 (2). McCans is clearly an experienced paramedic, and stated opinions formed on the basis of his experience. However, the opinions that he expressed based on that experience were not directly on point with the question before the trial court regarding emergency responders' duty after a 911 scene has been cleared by law enforcement and responders have been told they may cancel their response.

Here, McCans specifically testified that he was unaware of any standard, protocol, law or regulation – whether national, regional, or in Georgia – addressing the precise situation at issue in the instant case. While he did testify that, in his experience, EMTs and paramedics he had worked with or observed were "more aggressive" in attempting to find a patient, he did not aver that this experience amounted to any sort of standard or duty of care applicable anywhere – much less in Georgia – in cases where police examine a scene, tell EMTs no patient was found – or, in Surine's words, that the potential patient "[d]oesn't want to come to the door[.]" Although McCans deposed that "the end of staging" – meaning the point at which law enforcement notifies EMTs that it has completed a safety assessment – "isn't

17

cancellation" of an emergency response, and that police indicating "I don't want you, you can go, or you've got to go" does not mean EMTs cannot continue to do their jobs, he specifically acknowledged that he had never heard anyone else in his profession articulate that standard.

McCans has, at best, identified "discretionary" and "non-prohibited" actions by emergency responders applicable to a situation in which police examine the scene of a 911 call and tell responders that a patient cannot be or does not want to be found. He has specifically testified that others in his profession have not articulated any standard regarding what responders' duties are when police tell them they can or must cancel a call. Pretermitting any inconsistencies in McCans' affidavit and deposition testimony, which we do not assess,[11] we find that the trial court erred in denying National EMS's motion to exclude McCans' opinion testimony. McCans has essentially opined that National EMS should have done more, but has not established that a recognized standard of care required it to do more, nor has he articulated any standard of care requiring emergency responders to disbelieve or override what they are told by law enforcement at the scene. McCans has not articulated a reliable

[11] See *Thompson v. Ezor*, 272 Ga. 849, 853 (2) (536 SE2d 749) (2000) (holding contradictions in expert witness testimony are for the jury).

18

standard of care either through his own specific experience or that of others in his profession applicable to the situation at issue. Nor has he reliably applied any standard to the facts of this case.[12] When engaging in a reliability analysis, courts must be careful to focus on the expert's "principles and methodology, not on the conclusions that they generate." See *Daubert*, 509 U. S. at 595 (II) (B); see also *Webster v. Desai*, 305 Ga. App. 234, 235 (1) (699 SE2d 419) (2010) (referencing the four non-inclusive *Daubert* factors for assessing reliability, which include an

---

[12] We do not decide, in this opinion, what standard of care applies in situations such as the one presented here; we find only that McCans failed to articulate such a standard. Attempting to provide professional validation for McCans' opinions, Smith cites two affidavits from paramedics licensed in Georgia. One opines that he has "agreed to provide testimony that the standard of care in Georgia that is applicable to this case *is the same as what Mr. McCans has testified to* in his affidavit." (Emphasis supplied.) As we find that McCans has not articulated a standard of care, this expert's affidavit does not alter our analysis. The other expert's affidavit simply states that in his knowledge and experience dealing with similar responses to 911 calls for help by a third party, the National EMS paramedics "had reasonable cause for forced entry" and their failure to act was a "breach of duty." His affidavit does not discuss how he reached this conclusion and states only, without more, that he is "familiar with the standards of care applicable to the paramedic and EMT professions, generally, and familiar with the standard of care regarding duty to act and determining a patient by paramedics and EMTs." An expert's unexplained assurance that his or her opinions rely on accepted principles does not satisfy the reliability standards required by our courts and, thus, does not render McCans' opinions reliable. See generally *McClain v. Metabolife Intl., Inc.*, 401 F3d 1233, 1244 (III) (A) (11th Cir. 2005) (holding that an expert's assurances that he "has utilized generally accepted . . . methodology are insufficient") (citation and punctuation omitted).

19

assessment of whether a practice or theory has attained general acceptance in the relevant professional community). Further, when a witness relies

> solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. . . . If admissibility could be established merely by the *ipse dixit*[13] of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

(Citation and punctuation omitted; emphasis in original.) *U. S. v. Frazier*, 387 F3d 1244, 1261 (III) (A) (11th Cir. 2004); accord *Kumho Tire Co.*, 526 U. S. at 157 (III). As a result, Smith's Estate has not met the requirements of OCGA § 24-7-702 (b) (2) and (3) requiring that it show the expert's opinion testimony to be the product of reliable principles and methods which have been applied reliably to the facts of the case. The trial court erred in denying National EMS's motion to exclude McCans' opinion testimony regarding the standard of care.

---

[13] See *General Elec. Co.*, 522 U. S. at 146 (III) (discussing how "ipse dixit" means, in essence, testimony untethered to data; that is, an assertion made but not proven).

(b) Next, National EMS argues that the trial court erred in failing to grant its motion to exclude McCans' opinions regarding the asserted inadequacy of its training policies and procedures. National EMS contends that these opinions were unreliable because McCans admitted that he knew nothing about National EMS's policies and procedures, or about how the EMS crew members were trained.[14] We agree.

OCGA § 24-7-702 (b) (1) specifically requires that an expert's testimony be "based upon sufficient facts or data[.]" In an affidavit, McCans proffered eight critiques of National EMS's training policies and procedures. McCans, however, specifically deposed that he had not seen or been provided with any "agreement, training, policy or any other guidance to EMS providers, for this company, as to what to do in this situation." He deposed that he was not given any information regarding what the National EMS crew had been told, or whether they had been trained regarding what to do in a situation like the one at issue. He further averred that he did not know how the National EMS team had been trained, did not know whether they had completed any continuing education, and did not know whether they carried extrication equipment or were trained to use it.

---

[14] We note that the appellate brief filed by Smith's Estate does not address this contention of error.

21

It is axiomatic that how the National EMS paramedics responded in this situation turns not only on *whether and how* they were trained, but also on whether or not they *followed* any training they were given. McCans explicitly averred that he knew nothing about whether or how the National EMS crew was trained. Where an expert's opinion is based partially on speculation, this goes to the weight of the testimony rather than its admissibility. *Evans v. Dept. of Transp.*, 331 Ga. App. 313, 318 (2) (771 SE2d 20) (2015). Here, however, McCans' affidavit propounds that National EMS's training was inadequate, even though he deposed that he knew nothing about its training. "[T]he appropriate standard for assessing the admissibility of the opinion of [an] expert is not whether it is speculative or conjectural to some degree, but whether it is wholly so." *Layfield v. Dept. of Transp*., 280 Ga. 848, 850 (632 SE2d 135) (2006). "An expert may not render an opinion that is wholly speculative or conjectural." (Footnote omitted.) *Evans*, 331 Ga. App. at 318 (2). See *United States v. 0.161 Acres of Land*, 837 F2d 1036, 1040 (11th Cir. 1988) ("Certainly where an expert's testimony amounts to no more than a mere guess or speculation, a court should exclude his testimony."); see generally *HNTB Ga.*, 287 Ga. at 644-645 (2) (upholding trial court's exclusion of expert testimony as unreliable where expert conceded that he had no experience in the design or evaluation of

22

construction traffic control patterns about which he opined, and there had been no showing of why relevant experience in this area was unavailable). The trial court erred in denying National EMS's motion exclude McCans' testimony on the issue of National EMS's training procedures.

2. National EMS argues that the trial court erred in denying its motion for summary judgment on Smith's negligence claim by essentially finding that a fact question existed for the jury as to whether National EMS had a "legal duty to do more to try to reach Ms. Smith." We find that the trial court erred.

> The essential elements of a negligence claim are the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injuries; and damages. Thus, the threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff. *This issue is a question of law*. A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts.

(Citations and punctuation omitted; emphasis supplied.) *Boller*, 311 Ga. App. at 695-696 (1) (a); accord *Barrett v. Ga. Dept. of Transp.*, 304 Ga. App. 667, 669 (1) (697 SE2d 217) (2010).

23

The trial court's order and the argument of Smith's Estate on appeal both focus primarily on McCans' expert opinion for the establishment of a standard of care and, as the trial court put it, whether National EMS had a duty to "do more" to try to make contact with Smith. Smith's Estate points to OCGA § 51-1-27 to establish that Georgia law recognizes an action in tort where medical providers fail to comply with the standard of care. This is not in dispute. However, Smith's Estate argues only that "McCans has testified to what the standard of care requires in this context[;]" it does not direct us to any duty founded in statute or case law applicable to the precise situation at issue here – that is, the duty emergency responders have once law enforcement has cleared a scene and told them they may cancel their response because no patient has been found or wishes to be treated. *Boller*, 311 Ga. App. at 696 (1) (a). While the estate analogizes the duty it says exists to the duty created by the physician-patient relationship, see, e.g., *Rindsberg v. Neacsu*, 317 Ga. App. 269, 273 (730 SE2d 525) (2012),[15] we note that the crucial question here is, whether under

[15] Smith's Estate also argues that in the absence of a statutory or common law duty, National EMS voluntarily assumed a duty by responding to the 911 call and, therefore, was required to perform that duty in a non-negligent manner. The estate does not show how this argument was preserved for our review, and we do not address arguments for the first time on appeal that were neither raised nor ruled upon below. *Hawkins v. Blair*, 334 Ga. App. 898, 902 (3) (a) (780 SE2d 515) (2015).

24

any duty, National EMS violated the standard of care in not searching for a patient after law enforcement cleared the scene and told National EMS's workers that they could cancel their response and, thus, breached that duty. Given the foregoing, and our determination in Division 1, Smith's Estate has failed as a matter of law to show any breach of duty caused by a deviation from any appropriate standard of care in the situation at issue here.

> [A] legal duty is the obligation to conform to a standard of conduct under the law for the protection of others against unreasonable risks of harm. But the innocence of the plaintiff is immaterial to the existence of the legal duty on the part of the defendant in that the plaintiff will not be entitled to recover unless the defendant did something that it should not have done, i. e., an action, or failed to do something that it should have done, i. e., an omission, pursuant to the duty owed the plaintiff under the law.

(Citations and punctuation omitted.) *Stanley v. Garrett*, 356 Ga. App. 706, 709 (1) (848 SE2d 890) (2020). See *Ga. Dept. of Labor v. McConnell*, 305 Ga. 812, 816 (3) (a) (828 SE2d 352) (2019) (finding no general legal duty to all the world not to subject others to unreasonable risk of harm).

25

3. National EMS also argues that the trial court erred in denying summary judgment and finding that a fact question exists regarding whether any act or omission proximately caused Smith's death.     We agree.

Because Smith's Estate did not show that National EMS failed to conform to a recognized duty or obligation, National EMS was entitled to a grant of summary judgment, as a matter of law, and we need not address the element of causation at this point. *Georgia-Pacific Consumer Products, LP v. Ratner*, 345 Ga. App. 434, 443 (1) (b) (812 SE2d 120) (2018); see also *Webb v. Day*, 273 Ga. App. 491, 494 (3) (615 SE2d 570) (2005).

4. Finally, National EMS argues that the trial court erred in denying its motion for summary judgment on the Smith Estate's negligent hiring and training claims, as there was an absence of evidence supporting these claims.

The Smith Estate has failed to put forth specific evidence giving rise to a triable issue. *Padgett*, 321 Ga. App. at 69-70 (1). Nor does the estate address this enumeration in its appellate brief. Given this, and our determination in Division 1 (b), we agree that the trial court erred in denying National EMS's motion for summary judgment on this point.

*Case No. A23A0469*

26

In this appeal, Smith's Estate argues that the trial court erred in granting, in part, National EMS's motion for summary judgment on the estate's claims for punitive damages and attorney fees. Because we determined in Case No. A23A0291 that Smith's Estate did not prevail on its underlying claims, we disagree. "[A]wards of punitive damages and attorney fees are derivative of underlying claims, and where those claims fail, claims for punitive damages and attorney fees also fail." *Popham v. Landmark American Ins. Co.*, 340 Ga. App. 603, 612 (4) (798 SE2d 257) (2017); see also *Forsyth County v. Martin*, 279 Ga. 215, 219 (2) (c) (610 SE2d 512) (2005) (holding attorney fees are limited to those fees "attributable solely to the claim on which plaintiffs prevailed") (citation and punctuation omitted). We find no error.

In sum, in Case No. A23A0291, we reverse the trial court's denial of National EMS's motion to exclude McCans' expert witness testimony and we also reverse the trial court's denial of summary judgment to National EMS on the negligence claim and negligent hiring and training claim. In Case No. A23A0469, we affirm the trial court's grant of summary judgment to National EMS on the issues of punitive damages and attorney fees.

*Judgment affirmed in Case No. A23A0469; judgment reversed in Case No. A23A0291. Mercier, J., concurs. Miller, P. J., concurs in judgment only.*

27